**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **JENNIFER DRESSEL, individually and on behalf of all others similarly situated,**<br><br>**Plaintiff,**<br>**v.**<br><br>**CONTINUUM HEALTH ALLIANCE, LLC,**<br><br>**Defendant.** | **Civil Action No.: 3:24-cv-6176**<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Jennifer Dressel (collectively, "Plaintiff"), on behalf of herself and all others similarly situated, alleges as and for her Class Action Complaint, the following against Continuum Health Alliance, LLC ("Continuum" or "Defendant"). The following allegations are based upon Plaintiff's personal knowledge with respect to herself and her own acts, and following her investigation and the investigation of her counsel, and upon information and belief as to all other matters.

## I. INTRODUCTION

1. Continuum is a provider of health management and patient care coordination services to healthcare organizations and health insurers. As part of its operations, Continuum collects, maintains, and stores large volumes of Private Information belonging to its clients' current and former patients.

2. This class action is brought on behalf of citizens of all states in the United States who are the victims of a targeted, intentional cyber-attack on Defendant that allowed third party criminal hackers to access Defendant's computer systems and exfiltrate patient data from approximately October 18, 2023 to October 19, 2023 (the "Class" and "Class Members"), publicly exposing the highly sensitive information and medical records of approximately 377,119 patients

from Defendant's computer network ("the Data Breach").

3. Despite that Continuum became aware of the Data Breach by October 19, 2023, it failed to send notice to Plaintiff and the Class Members within 60 days as required by law. Incredibly, Continuum failed to notify Plaintiff of the Data Breach for ***more than six (6) months*** from its discovery of the same.

4. Continuum knowingly collected patient personally identifiable information ("PII"), and protected health information ("PHI") (collectively, "Private Information") in confidence, and has a resulting duty to secure, maintain, protect, and safeguard that Private Information against unauthorized access and disclosure through reasonable and adequate security measures.

5. PHI is considered "the most confidential and valuable type of [PII] . . . irrevocable once breached."[1]

6. As a result of the Data Breach, Plaintiff and Class Members suffered ascertainable losses, including, but not limited to, a diminution in the value of their private and confidential information, the loss of the benefit of their contractual bargain with Defendant, out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach.

7. Plaintiff's and Class Members' sensitive and private personal information – entrusted to Defendant, its officials, and agents – was compromised, unlawfully accessed, and stolen due to the Data Breach. Information compromised in the Data Breach includes name, Social Security number, date of birth, health insurance information, medical information, and phone number, other protected health information defined by HIPAA, and other Private Information.[2]

---

[1] Junyuan Ke, et al., *My Data or My Health? Heterogenous Patient Responses to Healthcare Data Breach*, SSRN (Feb. 10, 2022), http://dx.doi.org/10.2139/ssrn.4029103 (last visited May 14, 2024).

[2] Under the Health Insurance Portability and Accountability Act, 42 U.S.C. §§1320d, *et seq.* ("HIPAA"), PHI is considered to be individually identifiable information relating to the past,

8. Plaintiff brings this class action lawsuit on behalf of herself and all others similarly situated to address Defendant's inadequate safeguarding of Class Members' Private Information, for failing to provide timely and adequate notice to Plaintiff and other Class Members of the unauthorized access to their Private Information by an unknown third-party, and for failing to provide timely and adequate notice of precisely what information was accessed and stolen.

9. Defendant breached its duty to Plaintiff and Class Members by maintaining Plaintiff's and the Class Members' Private Information in a negligent and reckless manner.

10. Upon information and belief, the means of the Data Breach and potential risk for improper disclosure of Plaintiff's and Class Members' Private Information were known and foreseeable to Defendant. Thus, Defendant was on notice that failing to take steps necessary to secure the Private Information from those risks left the Private Information in a dangerous and vulnerable condition.

11. Defendant, and its employees, failed to properly monitor the computer network and systems housing the Private Information.

12. Had Defendant properly monitored its property, it would have discovered the intrusion sooner or been able to wholly prevent it.

13. Exacerbating an already devastating privacy intrusion, Plaintiff's and Class Members' identities are now at a heightened risk of exposure because of Defendant's negligent

---

present, or future health status of an individual that is created, collected, or transmitted, or maintained by a HIPAA-covered entity in relation to the provision of healthcare, payment for healthcare services, or use in healthcare operations. 45 C.F.R. §160.103. Health information such as diagnoses, treatment information, medical test results, and prescription information are considered protected health information under HIPAA, as are national identification numbers and demographic information such as birth dates, gender, ethnicity, and contact and emergency contact information. *Summary of the HIPAA Privacy Rule*, U.S. DEP'T OF HEALTH & HUMAN SERS., https://www.hhs.gov/hipaa/for-professionals/privacy/laws-regulations/index.html (last visited May 14, 2024).

conduct since the Private Information that Defendant collected and stored is now in the hands of data thieves.

14. Armed with the Private Information accessed in the Data Breach, data thieves have data from Continuum to commit a variety of crimes, including credit/debit card fraud, opening new financial accounts in Class Members' names, taking out loans in Class Members' names, using Class Members' names to obtain medical services, using Class Members' health information to target other phishing and hacking intrusions based upon their individual health needs, using Class Members' information to obtain government benefits, filing fraudulent tax returns using Class Members' information, obtaining driver's licenses in Class Members' names but with another person's photograph, and giving false information to police during an arrest.

15. As a direct result of the Data Breach, Plaintiff and Class Members are exposed to a heightened and imminent risk of fraud and identity theft, potentially for the rest of their lives. Plaintiff and Class Members must now and in the future closely monitor their financial accounts to guard against identity theft.

16. Plaintiff and Class Members will likely incur out-of- pocket costs for purchasing credit monitoring services, credit freezes, credit reports, and other protective measures to deter and detect identity theft.

17. As a direct and proximate result of the Data Breach and subsequent exposure of their Private Information, Plaintiff and Class Members have suffered, and will continue to suffer, damages and economic losses in the form of lost time needed to take appropriate measures to avoid unauthorized and fraudulent charges, putting alerts on their credit files, and dealing with spam messages and emails received as a result of the Data Breach.

18. Plaintiff and Class Members have suffered, and will continue to suffer, an invasion of their property interest in their own Private Information such that they are entitled to damages

from Defendant for unauthorized access to, theft of, and misuse of their Private Information. These harms are ongoing, and Plaintiff and Class Members will suffer from future damages associated with the unauthorized use and misuse of their Private Information as thieves will continue to use the information to obtain money and credit in their names for several years.

19. Plaintiff seeks to remedy these harms on behalf of all similarly situated individuals whose Private Information was accessed and/or removed from Defendant's network during the Data Breach.

20. Accordingly, Plaintiff bring this action, on behalf of herself and all others similarly situated, against Defendant seeking redress for its unlawful conduct asserting claims for negligence, negligence *per se*, invasion of privacy by intrusion, unjust enrichment, and violation of New Jersey's Consumer Fraud Act.

## II. PARTIES

21. 21. Plaintiff Jennifer Dressel ("Plaintiff Dressel") is a resident of Monroe Township, New Jersey and a citizen of New Jersey. Plaintiff Dressel provided her Private Information to a client of Continuum who shared her Private Information with Continuum. Ms. Dressel received a letter notice from Continuum, dated April 29, 2024, notifying her that her Private Information was improperly exposed to unauthorized third parties.

22. Defendant Continuum is a Delaware limited liability company with its principal place of business located at 402 Lippincott Drive, Marlton, New Jersey 08053.

## III. JURISDICTION AND VENUE

23. This Court has subject-matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. §1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs, and there are over 300,000 members in the proposed class, many of whom are citizens of states different from Defendant.

24. This Court has personal jurisdiction over Defendant because Continuum is headquartered in New Jersey, its principal place of business is in New Jersey, and it regularly conducts business in New Jersey.

25. Venue is proper in this Court pursuant to 28 U.S.C. §1391 because Defendant resides in this District, a substantial part of the events, acts, and omissions giving rise to Plaintiff's claims occurred in, was directed to, and/or emanated from this District, Continuum is based in this District, Continuum maintains patients' Private Information in the District, and Defendant has caused harm to Plaintiff and Class Members residing in this District.

## IV. STATEMENT OF FACTS

### *A. The Data Breach*

26. Between October 18, 2023 and October 19, 2023, unauthorized third-party computer hackers accessed Continuum's computer systems and acquired files stored on those systems including Plaintiff's and Class Members' Private Information. The unauthorized third-party computer hackers exfiltrated the Private Information of Plaintiff and Class Members from Continuum's computer systems and exposed the Private Information for sale to other cybercriminals.

27. After learning of the Data Breach, Continuum commenced an investigation. That investigation revealed that approximately 377,119 patients were victims of the cybersecurity incident. The investigation further revealed that information accessed and taken by the hackers includes patients' names, Social Security numbers, dates of birth, health insurance information, medical information, phone numbers, and other Private Information that Continuum collected and maintained.

28. On February 16, 2024, a Notice of Data Privacy Event was posted on Consensus Medical Group's ("CMG") website (https://www.consensushealth.com/notice-of-data-privacy-

event/), stating the following:

> **What Happened?** On October 19, 2023, Continuum discovered suspicious activity within our network. In response, we immediately took steps to secure our systems and initiated an investigation into the nature and scope of the event with the assistance of third-party industry specialists. The investigation determined that an unauthorized actor gained access to certain systems in Continuum's network between October 18, 2023 and October 19, 2023, and accessed or acquired certain files stored on those systems during this time. We identified the affected files and conducted a comprehensive review of the files in order to identify the type of information contained therein, and to whom the information relates.
>
> On February 16, 2024, we concluded our extensive review of the impacted data, and began working to identify current contact information and notify potentially impacted individuals directly.
>
> **What Information Was Involved?** The type of information that may be impacted by the event varies per person, and includes one or more of the following types of information: individuals' names, addresses, health insurance information, treatment and/or diagnosis code, provider name, and dates of treatment. Although the investigation was unable to confirm whether your information was actually viewed by the unauthorized actor, we are unable to rule out this possibility. Please note that Continuum is not aware of actual or attempted fraudulent misuse of any individual's information as a result of this event.

29. Defendant did not inform individual patients who were impacted by the Data Breach until April 29, 2024. The Notice of Security Incident ("Data Breach Notice" or "Notice") that Defendant sent to affected individuals states the following:

> **What Happened?** On October 19, 2023, Continuum discovered suspicious activity within our network. In response, we immediately took steps to secure our systems and initiated an investigation into the nature and scope of the event with the assistance of third-party industry specialists. The investigation determined that an unauthorized actor gained access to certain systems in our network between October 18, 2023 and October 19, 2023, and accessed or acquired certain files stored on those systems during this time. We identified the affected files and conducted a comprehensive review of the files in order to identify the type of information contained therein, and to whom the information relates. On March 8, 2024, this extensive review was completed, and we confirmed the extent of information involved. Since this time, Continuum has worked to verify the information and locate missing addresses in order to provide an accurate notice.
>
> **What Information Was Involved?** Our review determined that the following types of information were present in the files that were accessed and acquired by the unauthorized actor: your name, Social Security number, date of birth, health insurance information, medical information, and phone number. Although the

> investigation was unable to confirm whether your information was actually viewed by the unauthorized actor, we are unable to rule out this possibility. Please note that Continuum is not aware of actual or attempted fraudulent misuse of any individual's information as a result of this event.

30. It took Continuum over six (6) months after the Data Breach to individually notify affected patients, like Plaintiff and Class Members, of the Data Breach, resulting in Plaintiff and Class Members suffering harm they otherwise may have been able to avoid had Continuum sent them notice of the Data Breach sooner.

31. Continuum's Data Breach Notice was untimely and woefully deficient, failing to provide basic details concerning the Data Breach, including, but not limited to, how unauthorized parties accessed its computer systems, whether the information was encrypted or otherwise protected, how it learned of the Data Breach, whether the breach was a system-wide breach, whether servers storing information were accessed, and how many patients were affected by the Data Breach.

32. Given the intentional and criminal nature of the cybersecurity hack, Plaintiff's and Class Members' Private Information is now for sale to criminals on the dark web; meaning unauthorized parties have accessed and viewed Plaintiff's and Class Members' unencrypted, unredacted Private Information, including name, Social Security number, date of birth, health insurance information, medical information, phone number, and more.

***C. Plaintiff's Experiences Following the Data Breach***

***<u>Plaintiff Jennifer Dressel</u>***

33. Plaintiff Dressel provided her Private Information to a client of Continuum who shared her Private Information with Continuum.

34. On multiple occasions, Plaintiff Dressel has been required to provide her Private Information as a condition of her medical treatment.

35. Plaintiff received a Notice of the Security Incident dated April 29, 2024, sent by

Defendant.

36. After receiving the Data Breach Notice, Plaintiff spent time dealing with the consequences of the Data Breach and continues to spend time dealing with the consequences of the Data Breach, including reviewing and monitoring her bank accounts and credit card accounts for fraudulent activity, researching the Data Breach, and implementing a credit freeze through Experian, TransUnion and Equifax, all as a result of her Private Information being exposed in the Data Breach. Plaintiff Dressel intends to spend additional time and effort taking steps to protect her Private Information in the future. Because of the Data Breach, Plaintiff Dressel spent valuable time she otherwise would have spent on other obligations.

37. Moreover, Plaintiff Dressel spent this time at Continuum's direction. In the Data Breach Notice Plaintiff Dressel received, Continuum encouraged Plaintiff to spend time mitigating her losses by "reviewing your account statements and monitoring your free credit reports for suspicious activity and to detect errors" and "to remain vigilant against incidents of identity theft and fraud[.]"

38. As a result of the Data Breach, Plaintiff Dressel has suffered lost time, annoyance, interference, and inconvenience as a result of the Data Breach. This is time Ms. Dressel otherwise would have spent performing other activities, such as her job and/or leisurely activities for the enjoyment of life.

39. In addition, Plaintiff Dressel has suffered and will continue to suffer emotional distress as a result of the Data Breach, and has increased concerns for the loss of her privacy and the release of her protected health information, which she would not have suffered had Defendant Continuum implemented the necessary and proper safeguards to protect its patients' Private Information from theft.

40. The Private Information that was accessed by an unknown actor was the kind of

sensitive information that can be used to commit fraud and identity theft. It was reasonable and foreseeable that Plaintiff Dressel would take, and continue to take, necessary measures to protect her Private Information.

41. Plaintiff Dressel has a continuing interest in ensuring that her Private Information, which, upon information and belief, remains in Continuum's possession, is protected and safeguarded from further and future breaches.

42. Plaintiff Dressel has suffered actual injury in the form of lost time by having to deal with all the consequences of the Data Breach, including reviewing and monitoring her bank accounts, credit card accounts, researching the potential impact of the Data Breach, and implementing a credit freeze through Experian, TransUnion and Equifax, all as a result of her Private Information being exposed in the Data Breach.

***D. The Healthcare Sector Is Particularly Susceptible to Cyberattacks***

43. Defendant was specifically on notice that the Federal Bureau of Investigation ("FBI") has been concerned about data security in the healthcare industry. In August 2014, after a cyberattack on Community Health Systems, Inc., the FBI warned companies within the healthcare industry that hackers were targeting them. The warning stated that "'[t]he FBI has observed malicious actors targeting healthcare related systems, perhaps for the purpose of obtaining the Protected Healthcare Information (PHI) and/or Personally Identifiable Information (PII).'"[3]

44. The American Medical Association ("AMA") has also warned healthcare companies about the importance of protecting their patients' confidential information:

> Cybersecurity is not just a technical issue; it's a patient safety issue. AMA research has revealed that 83% of physicians work in a practice

[3] Jim Finkle, *FBI warns healthcare firms that they are targeted by hackers*, REUTERS (Aug. 20, 2014), https://www.reuters.com/article/us-cybersecurity-healthcare-fbi/fbi-warns-healthcare- firms-they-are-targeted-by-hackers-idUSKBN0GK24U20140820 (last visited May 14, 2024)

> that has experienced some kind of cyberattack. Unfortunately, practices are learning that cyberattacks not only threaten the privacy and security of patients' health and financial information, but also patient access to care.[4]

45. The number of U.S. data breaches surpassed 1,000 in 2016, a record high and a forty percent increase in the number of data breaches from the previous year.[5] In 2017, a new record high of 1,579 breaches were reported representing a 44.7% increase.[6] That upward trend continues.

46. The healthcare sector reported the second largest number of breaches among all measured sectors in 2018, with the highest rate of exposure per breach.[7] Indeed, when compromised, healthcare related data is among the most sensitive and personally consequential. A report focusing on healthcare breaches found that the "average total cost to resolve an identity theft-related incident . . . came to about $20,000," and that the victims were often forced to pay out-of-pocket costs for healthcare they did not receive in order to restore coverage.[8] Almost 50% of the victims lost their healthcare coverage as a result of the incident, while nearly thirty percent said their insurance premiums went up after the event. Forty percent of the customers were never able to resolve their identity theft at all. Data breaches and identity theft have a crippling effect on

---

[4] Andis Robeznieks, *Cybersecurity: Ransomware attacks shut down clinics, hospitals*, AM. MED. ASS'N (Oct. 4, 2019), https://www.ama-assn.org/practice-management/sustainability/cybersecurity-ransomware-attacks-shut-down-clinics-hospitals (last accessed on May 14, 2024).

[5] *Data Breaches Increase 40 Percent in 2016, Finds New Report From Identity Theft Resource Center and CyberScout* CISION PR NEWSWIRE (Jan. 19, 2017), https://www.prnewswire.com/news-releases/data-breaches-increase-40-percent-in-2016-finds-new-report-from-identity-theft-resource-center-and-cyberscout-300393208.html (last visited May 14, 2024).

[6] *2017 Annual Data Breach Year-End Review*, IDENTITY THEFT RES.CTR., https://www.idtheftcenter.org/wp-content/uploads/images/breach/2017Breaches/2017AnnualDataBreachYearEndReview.pdf (last visited May 14, 2024).

[7] *2018 End-of-Year Data Breach Report*, IDENTITY THEFT RES.CTR., https://www.idtheftcenter.org/wp-content/uploads/2019/02/ITRC_2018-End-of-Year-Aftermath_FINAL_V2_combinedWEB.pdf (last visited May 14, 2024).

[8] Elinor Mills, *Study: Medical identity theft is costly for victims*, CNET (Mar. 3, 2010), https://www.cnet.com/news/study-medical-identity-theft-is-costly-for-victims/.

individuals and detrimentally impact the economy as a whole.[9]

47. Healthcare related data breaches have continued to rapidly increase. According to the 2019 HIMSS Cybersecurity Survey, 82% of participating hospital information security leaders reported having a significant security incident in the last 12 months, with a majority of these known incidents being caused by "bad actors" such as cybercriminals.[10]

> Hospitals have emerged as a primary target because they sit on a gold mine of sensitive personally identifiable information (PII) for thousands of patients at any given time. From social security and insurance policies to next of kin and credit cards, no other organization, including credit bureaus, have so much monetizable information stored in their data centers.[11]

48. Continuum knew, or reasonably should have known, the importance of safeguarding the patients' Private Information entrusted to it, and of the foreseeable consequences if its data security systems were breached. The consequences include the significant costs that would be imposed on patients as a result of a breach. Continuum failed, however, to take adequate cybersecurity measures to prevent the Data Breach from occurring.

***E. Continuum Acquires, Collects, and Stores Its Patients' Private Information***

49. Continuum acquires, collects, and stores a massive amount of patients' protected health information and other personally identifiable data.

50. As a condition of engaging in health services, Continuum requires that these patients entrust them with highly confidential Private Information.

51. By obtaining, collecting, using, and deriving a benefit from Plaintiff's and Class Members' Private Information, Continuum assumed legal and equitable duties and knew or should

---

[9] *Id.*

[10] *2019 HIMSS Cybersecurity Survey*, HIMSS, https://www.himss.org/sites/hde/files/d7/u132196/2019_HIMSS_Cybersecurity_Survey_Final_Report.pdf (last visited May 14, 2024).

[11] Eyal Benishti, *How to Safeguard Hospital Data from Email Spoofing Attacks*, CHIEF HEALTHCARE EXEC. (Apr. 4, 2019), https://www.chiefhealthcareexecutive.com/view/how-to-safeguard-hospital-data-from-email-spoofing-attacks (last visited May 14, 2024).

have known that it was responsible for protecting Plaintiff and Class Members' Private Information from disclosure.

52. Plaintiff and Class Members have taken reasonable steps to maintain the confidentiality of their Private Information, and, as current and former patients, they relied on Continuum to keep this information confidential and securely maintained, to use this information for business purposes only, and to make only authorized disclosures of this information.

***F. The Value of Private Information and the Effects of Unauthorized Disclosure***

53. At all relevant times, Defendant was well aware that the Private Information collected from Plaintiff and Class Members is highly-sensitive and of significant value to those who would use it for wrongful purposes.

54. Private Information is a valuable commodity to identity thieves. As the Federal Trade Commission ("FTC") recognizes, identity thieves can use this information to commit an array of crimes including identify theft, and medical and financial fraud.[12] Indeed, a robust "cyber black market" exists in which criminals openly post stolen Private Information on multiple underground Internet websites, commonly referred to as the dark web.

55. While credit card information and associated PII can sell for as little as $1-$2 on the black market, PHI can sell for as much as $363 according to the Infosec Institute.[13]

56. PHI is particularly valuable because criminals can use it to target victims with frauds and scams that take advantage of the victim's medical conditions or victim settlements. It can be used to create fake insurance claims, allowing for the purchase and resale of medical equipment, or gain access to prescriptions for illegal use or resale.

[12] *What to Know About Identify Theft*, FED. TRADE COMM'N, https://www.consumer.ftc.gov/articles/0271-warning-signs-identity-theft (last visited May 14, 2024).

[13] *Data Breaches: In the Healthcare Sector,* CTR. FOR INTERNET SEC., https://www.cisecurity.org/blog/data-breaches-in-the-healthcare-sector/ (last visited May 14, 2024).

57. Medical identify theft can result in inaccuracies in medical records and costly false claims. It can also have life-threatening consequences. If a victim's health information is mixed with other records, it can lead to misdiagnosis or mistreatment. "'Medical identity theft is a growing and dangerous crime that leaves its victims with little to no recourse for recovery,'" reported Pam Dixon, executive director of World Privacy Forum. "'Victims often experience financial repercussions and worse yet, they frequently discover erroneous information has been added to their personal medical files due to the thief's activities.'"[14]

58. Similarly, the FBI Cyber Division, in an April 8, 2014 Private Industry Notification, advised:

> Cyber criminals are selling [medical] information on the black market at a rate of $50 for each partial EHR, compared to $1 for a stolen social security number or credit card number. EHR can then be used to file fraudulent insurance claims, obtain prescription medication, and advance identity theft. EHR theft is also more difficult to detect, taking almost twice as long as normal identity theft.[15]

59. The ramifications of Continuum's failure to keep its patients' Private Information secure are long lasting and severe. Once Private Information is stolen, fraudulent use of that information and damage to victims may continue for years. Fraudulent activity might not show up for six to 12 months or even longer.

60. Further, criminals often trade stolen Private Information on the "cyber black-market" for years following a breach. Cybercriminals can post stolen Private Information on the internet, thereby making such information publicly available.

61. This gives thieves ample time to seek multiple treatments under the victim's name. 40% of consumers found out they were a victim of medical identity theft only when they received

---

[14] Michael Ollove, *The Rise of Medical Identity Theft in Healthcare*, KAISER HEALTH NEWS (Feb. 7, 2014), https://khn.org/news/rise-of-indentity-theft/ (last accessed May 14, 2024).

[15] *Health Care Systems and Medical Devices at Risk for Increased Cyber Intrusions for Financial Gain*, FBI CYBER DIV. (Apr. 8, 2014), https://info.publicintelligence.net/FBI-HealthCareCyberIntrusions.pdf (last accessed May 14, 2024).

collection letters from creditors for expenses that were incurred in their names.[16]

62. Continuum knew, or reasonably should have known, the importance of safeguarding patients' Private Information entrusted to it, and of the foreseeable consequences if its data security systems were breached. This includes the significant costs that would be imposed on patients as a result of a breach. Continuum failed, however, to take adequate cybersecurity measures to prevent the Data Breach from occurring.

***G. Continuum's Conduct Violates HIPAA***

63. HIPAA requires covered entities to protect against reasonably anticipated threats to the security of PHI. Covered entities must implement safeguards to ensure the confidentiality, integrity, and availability of PHI. Safeguards must include physical, technical, and administrative components.[17]

64. Title II of HIPAA contains what are known as the Administrative Simplification provisions. 42 U.S.C. §§1301, et seq. These provisions require, among other things, that the Department of Health and Human Services ("HHS") create rules to streamline the standards for handling Private Information like the data Defendant left unguarded. The HHS has subsequently promulgated five rules under authority of the Administrative Simplification provisions of HIPAA.

65. The HIPAA Breach Notification Rule, 45 CFR §§164.400-414, also required Defendant to provide notice of the breach to each affected individual "without unreasonable delay and in no case later than 60 days following discovery of a breach."[18]

---

[16] *The Potential Damages and Consequences of Medical Identify Theft and Healthcare Data Breaches ("Potential Damages*"), EXPERIAN (Apr. 2010), https://www.experian.com/assets/data-breach/white-papers/consequences-medical-id-theft-healthcare.pdf.

[17] *What is Considered Protected Health Information Under HIPAA?*, HIPAA J., (Jan. 1, 2023), https://www.hipaajournal.com/what-is-considered-protected-health-information-under-hipaa/ (last accessed May 14, 2024).

[18] *Breach Notification Rule*, U.S. DEP'T OF HEALTH & HUMAN SERVS., https://www.hhs.gov/hipaa/for-professionals/breach-notification/index.html (last visited May 14, 2024).

66. Based on information and belief, Defendant's Data Breach resulted from a combination of insufficiencies that demonstrate Defendant failed to comply with safeguards mandated by HIPAA regulations. Continuum' security failures include, but are not limited to, the following:

i. Failing to ensure the confidentiality and integrity of electronic protected health information that Defendant creates, receives, maintains, and transmits in violation of 45 C.F.R. §164.306(a)(1);

ii. Failing to implement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights in violation of 45 C.F.R. §164.312(a)(1);

iii. Failing to implement policies and procedures to prevent, detect, contain, and correct security violations in violation of 45 C.F.R. §164.308(a)(1);

iv. Failing to identify and respond to suspected or known security incidents; mitigate, to the extent practicable, harmful effects of security incidents that are known to the covered entity in violation of 45 C.F.R. §164.308(a)(6)(ii);

v. Failing to protect against any reasonably-anticipated threats or hazards to the security or integrity of electronic protected health information in violation of 45 C.F.R. §164.306(a)(2);

vi. Failing to protect against any reasonably anticipated uses or disclosures of electronically protected health information that are not permitted under the privacy rules regarding individually identifiable health information in violation of 45 C.F.R. §164.306(a)(3);

vii. Failing to ensure compliance with HIPAA security standard rules by their workforce in violation of 45 C.F.R. §164.306(a)(94);

viii. impermissibly and improperly using and disclosing protected health information that is and remains accessible to unauthorized persons in violation of 45 C.F.R. §164.502, *et seq.*;

ix. Failing to effectively train all members of their workforce (including independent contractors) on the policies and procedures with respect to protected health information as necessary and appropriate for the members of their workforce to carry out their functions and to maintain security of protected health information in violation of 45 C.F.R. §164.530(b) and 45 C.F.R. §164.308(a)(5); and

x. Failing to design, implement, and enforce policies and procedures establishing physical and administrative safeguards to reasonably safeguard protected health information, in compliance with 45 C.F.R. §164.530(c).

### *H. Continuum Failed to Comply with FTC Guidelines*

67. Continuum was also prohibited by the Federal Trade Commission Act ("FTCA") (15 U.S.C. §45) from engaging in "unfair or deceptive acts or practices in or affecting commerce." The FTC has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of the FTCA. *See, e.g.*, *FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236 (3d Cir. 2015).

68. The FTC has promulgated numerous guides for businesses that highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.[19]

69. In 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which established cybersecurity guidelines for businesses.[20] The guidelines note that businesses should protect the personal customer information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.

70. The FTC further recommends that companies not maintain Private Information longer than is needed for authorization of a transaction; limit access to private data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.[21]

---

[19] *Start With Security: A Guide for Business*, FED. TRADE COMM'N, https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf (last visited May 14, 2024).

[20] *Protecting Personal Information: A Guide for Business*, FEDERAL TRADE COMMISSION,available at: https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last visited May 14, 2024).

[21] *See Start With Security: A Guide for Business*, FED. TRADE COMM'N, https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf (last visited May 14, 2024).

71. The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the FTCA, 15 U.S.C. §45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

72. Continuum failed to properly implement basic data security practices. Continuum's failure to employ reasonable and appropriate measures to protect against unauthorized access to patients' Private Information constitutes an unfair act or practice prohibited by Section 5 of the FTCA, 15 U.S.C. §45.

73. Continuum was at all times fully aware of its obligation to protect the Private Information of patients because of its position in the healthcare arena. Continuum was also aware of the significant repercussions that would result from its failure to do so.

### *I. Continuum Failed to Comply with Healthcare Industry Standards*

74. HHS's Office for Civil Rights notes:

> While all organizations need to implement policies, procedures, and technical solutions to make it harder for hackers to gain access to their systems and data, this is especially important in the healthcare industry. Hackers are actively targeting healthcare organizations as they store large quantities of highly sensitive and valuable data.[22]

75. HHS highlights several basic cybersecurity safeguards that can be implemented to improve cyber resilience that require a relatively small financial investment yet can have a major impact on an organization's cybersecurity posture including: (a) the proper encryption of Private Information; (b) educating and training healthcare employees on how to protect Private

---

[22] *Cybersecurity Best Practices for Healthcare Organizations*, HIPAA J. (Nov. 1, 2018), https://www.hipaajournal.com/important-cybersecurity-best-practices-for-healthcare-organizations/ (last accessed May 14, 2024).

Information; and (c) correcting the configuration of software and network devices.

76. Private cybersecurity firms have also identified the healthcare sector as being particularly vulnerable to cyber-attacks, both because the of value of the Private Information which they maintain and because as an industry they have been slow to adapt and respond to cybersecurity threats.[23] They too have promulgated similar best practices for bolstering cybersecurity and protecting against the unauthorized disclosure of Private Information.

77. Despite the abundance and availability of information regarding cybersecurity best practices for the healthcare industry, Continuum chose to ignore them. These best practices were known, or reasonably should have been known by Continuum, whose failure to heed and properly implement them directly led to the Data Breach and the unlawful exposure of Private Information.

***J. Cyber Criminals Have and Will Continue to Use Plaintiff's and Class Members' PII for Nefarious Purposes***

78. Plaintiff's and Class Members' highly sensitive PII is of great value to hackers and cybercriminals, and the data stolen in the Data Breach can be used in a variety of ways for criminals to exploit Plaintiff and the Class Members and to profit off their misfortune and stolen information. The cybercriminals' motives for the Data Breach were purely nefarious and malicious in nature: their one goal was to access Continuum's systems in order to obtain valuable PII to sell on the dark web.

79. Every year, identity theft causes tens of billions of dollars of losses to victims in the United States.[24] For example, with the PII stolen in the Data Breach, including Social Security

[23] *See e.g.*, *10 Best Practices for Healthcare Security*, INFOSEC (Sept. 27, 2016), https://www.infosecinstitute.com/resources/healthcare-information-security/10-best-practices-healthcare-security/ (last accessed May 14, 2024).

[24] *Facts + Statistics: Identity Theft and Cybercrime*, INS. INFO. INSTITUTE, https://www.iii.org/fact-statistic/facts-statistics-identity-theft-and-cybercrime (last visited May 14, 2024) (discussing Javelin Strategy & Research's report *2018 Identity Fraud: Fraud Enters a New Era of Complexity*).

numbers and bank account information, identity thieves can open financial accounts, apply for credit, file fraudulent tax returns, commit crimes, create false driver's licenses and other forms of identification and sell them to other criminals or undocumented immigrants, steal government benefits, give breach victims' names to police during arrests, and many other harmful forms of identity theft.[25] These criminal activities have and will result in devastating financial and personal losses to Plaintiff and Class Members.

80. PII is such a valuable commodity to identity thieves that once it has been compromised, criminals will use it and trade the information on the cyber black-market for years.

81. These risks are both certainly impending and substantial. As the FTC has reported, if hackers get access to personally identifiable information, they will use it.[26]

82. Hackers may not use the information right away. According to the U.S. Government Accountability Office, which conducted a study regarding data breaches:

> [I]n some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[27]

83. For instance, with a stolen Social Security number, which is part of the PII compromised in the Data Breach, someone can open financial accounts, get medical care, file

---

[25] *See, e.g.*, Christine DiGangi, *5 Ways an Identity Thief Can Use Your Social Security Number*, CREDIT.COM (Nov. 2, 2017), https://www.credit.com/blog/5-things-an-identity-thief-can-do-with-your-social-security-number-108597/ (last accessed May 14, 2024).

[26] Ari Lazarus, *How fast will identity thieves use stolen info?*, FED. TRADE COMM'N (May 24, 2017), https://www.militaryconsumer.gov/blog/how-fast-will-identity-thieves-use-stolen-info (May 14, 2024).

[27] Stolen Laptops Lead to Important HIPAA Settlements, U.S. DEP'T OF HEALTH & HUMAN SERVS. (Apr. 22, 2014), https://www.hhs.gov/about/news/2014/04/22/stolen-laptops-lead-to-important-hipaa-settlements.html [https://wayback.archive-it.org/all/20170127085330/https://www.hhs.gov/about/news/2014/04/22/stolen-laptops-lead-to-important-hipaa-settlements.html].

fraudulent tax returns, commit other crimes, and steal benefits.[28]

84. If cyber criminals manage to access financial information, health insurance information, and other personally sensitive data – as they did here – there is no limit to the amount of fraud to which Defendant may have exposed the Plaintiff and Class Members.

### *K. Plaintiff and Class Members Suffered Damages*

85. The ramifications of Continuum's failure to keep patients' Private Information secure are long lasting and severe. Once Private Information is stolen, fraudulent use of that information and damage to victims may continue for years. Consumer victims of data breaches are more likely to become victims of identity fraud.[29]

86. In addition to their obligations under state laws and regulations, Defendant owed a common law duty to Plaintiff and Class Members to protect Private Information entrusted to it, including to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the Private Information in its possession from being compromised, lost, stolen, accessed, and misused by unauthorized parties.

87. Defendant further owed and breached its duty to Plaintiff and Class Members to implement processes and specifications that would detect a breach of its security systems in a timely manner and to timely act upon warnings and alerts, including those generated by its own security systems.

88. As a direct result of Defendant's intentional, willful, reckless, and negligent conduct which resulted in the Data Breach, unauthorized parties were able to access, acquire, view, publicize, and/or otherwise cause the identity theft and misuse of Plaintiff's and Class Members'

---

[28] *See, e.g.*, Christine DiGangi, *5 Ways an Identity Thief Can Use Your Social Security Number*, CREDIT.COM (Nov. 2, 2017), https://www.credit.com/blog/5-things-an-identity-thief-can-do-with-your-social-security-number-108597/ (last accessed May 14, 2024).
[29] *2014 LexisNexis True Cost of FraudStudy*, LEXISNEXIS (Aug. 2014), https://www.lexisnexis.com/risk/downloads/assets/true-cost-fraud-2014.pdf.

Private Information as detailed above, and Plaintiff is now at a heightened risk of identity theft and fraud.

89. The risks associated with identity theft are serious. While some identity theft victims can resolve their problems quickly, others spend hundreds of dollars and many days repairing damage to their good name and credit record. Some consumers victimized by identity theft may lose out on job opportunities, or be denied loans for education, housing or cars because of negative information on their credit reports. In rare cases, they may even be arrested for crimes they did not commit.

90. Other risks of identity theft include loans opened in the name of the victim, medical services billed in their name, utility bills opened in their name, tax return fraud, and credit card fraud.

91. Plaintiff and Class Members did not receive the full benefit of the bargain for received healthcare and other services. Instead, these services were of a diminished value. As a result, Plaintiff was damaged in an amount at least equal to the difference in the value of the healthcare with data security protection they paid for and the healthcare they received without the data security protection.

92. As a result of the Data Breach, Plaintiff's and Class Members' Private Information has diminished in value.

93. The Private Information belonging to Plaintiff and Class Members is private, private in nature, and was left inadequately protected by Defendant who did not obtain Plaintiff's or Class Members' consent to disclose such Private Information to any other person as required by applicable law and industry standards.

94. The Data Breach was a direct and proximate result of Defendant's failure to: (a) properly safeguard and protect Plaintiff's and Class Members' Private Information from

unauthorized access, use, and disclosure, as required by various state and federal regulations, industry practices, and common law; (b) establish and implement appropriate administrative, technical, and physical safeguards to ensure the security and confidentiality of Plaintiff's and Class Members' Private Information; and (c) protect against reasonably foreseeable threats to the security or integrity of such information.

95. Defendant had the resources necessary to prevent the Data Breach, but neglected to adequately implement data security measures, despite its obligation to protect patient data.

96. Had Defendant remedied the deficiencies in its data security systems and adopted security measures recommended by experts in the field, it would have prevented the intrusions into its systems and, ultimately, the theft of Plaintiff's and Class Members' Private Information.

97. As a direct and proximate result of Defendant's wrongful actions and inactions, Plaintiff and Class Members have been placed at an imminent, immediate, and continuing increased risk of harm from identity theft and fraud, requiring them to take the time which they otherwise would have dedicated to other life demands such as work and family in an effort to mitigate the actual and potential impact of the Data Breach on their lives.

98. The U.S. Department of Justice's Bureau of Justice Statistics found that "among victims who had personal information used for fraudulent purposes, 29% spent a month or more resolving problems" and that "[r]esolving the problems caused by identity theft [could] take more than a year for some victims."[30]

99. Defendant's failure to adequately protect Plaintiff's and Class Members' Private Information has resulted in Plaintiff and Class Members having to undertake these tasks, which require extensive amounts of time, calls, and, for many of the credit and fraud protection services,

---

[30] Erika Harrell, & Lynn Langton, *Victims of Identity Theft, 2012*, U.S. DEP'T OF JUST., OFF. OF JUST. PROGRAMS BUREAU OF JUST STATS. (Dec. 2013), https://bjs.ojp.gov/content/pub/pdf/vit12.pdf (last accessed May 14, 2024).

payment of money – while Defendant sits by and does nothing to assist those affected by the incident. Instead, as Continuum's Data Breach Notice indicates, it is putting the burden on Plaintiff and Class Members to discover possible fraudulent activity and identity theft.

100. As a result of Defendant's failures to prevent the Data Breach, Plaintiff and Class Members have suffered, will suffer, and are at increased risk of suffering:

i. The compromise, publication, theft and/or unauthorized use of their Private Information;

ii. Out-of-pocket costs associated with the prevention, detection, recovery and remediation from identity theft or fraud;

iii. Lost opportunity costs and lost wages associated with efforts expended and the loss of productivity from addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest and recover from identity theft and fraud;

iv. The continued risk to their Private Information, which remains in the possession of Defendant and is subject to further breaches so long as Defendant fails to undertake appropriate measures to protect the Private Information in its possession;

v. Current and future costs in terms of time, effort and money that will be expended to prevent, detect, contest, remediate, and repair the impact of the Data Breach for the remainder of the lives of Plaintiff and Class Members; and

vi. Anxiety and distress resulting from fear of misuse of their medical information.

101. In addition to a remedy for the economic harm, Plaintiff and Class Members maintain an undeniable interest in ensuring that their Private Information is secure, remains secure, and is not subject to further misappropriation and theft.

### *L. Continuum's Delay in Identifying & Reporting the Breach Caused Additional Harm*

102. It is axiomatic that:

> The quicker a financial institution, credit card issuer, wireless carrier or other service provider is notified that fraud has occurred on an account, the sooner these organizations can act to limit the damage. Early notification can also help limit the liability of a victim in some cases, as well as allow more time for law enforcement to catch the

fraudsters in the act.[31]

103. Indeed, once a data breach has occurred

> [o]ne thing that does matter is hearing about a data breach quickly. That alerts consumers to keep a tight watch on credit card bills and suspicious emails. It can prompt them to change passwords and freeze credit reports. And notifying officials can help them catch cybercriminals and warn other businesses of emerging dangers.
>
> 'If consumers don't know about a breach because it wasn't reported, they can't take action to protect themselves....... '[32]

104. Although their Private Information was improperly exposed on or about October 18, 2023, Plaintiff and Class Members were not notified of the Data Breach until April of 2024, depriving them of the ability to promptly mitigate potential adverse consequences resulting from the Data Breach.

105. As a result of Defendant's delay in detecting and notifying consumers of the Data Breach, the risk of fraud for Plaintiff and Class Members has been driven even higher.

## V. CLASS ALLEGATIONS

106. Plaintiff brings this class action on behalf of herself and on behalf of all others similarly situated pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure.

107. The Nationwide Class that Plaintiff seeks to represent is defined as follows:

> **Nationwide Class: All individuals whose Private Information was compromised in the data breach of Continuum's systems from approximately October 18, 2023 to October 19, 2023.**

108. In the alternative to the Nationwide Class, Plaintiff seeks certification of the

---

[31] *Identity Fraud Hits Record High with 15.4 Million U.S. Victims in 2016, Up 16 Percent According to New Javelin Strategy & Research Study*, BUSINESS WIRE (Feb. 1, 2017), https://www.businesswire.com/news/home/20170201005166/en/Identity-Fraud-Hits-Record- High-15.4-Million (last accessed May 14, 2024).

[32] Allen St. John, *The Data Breach Next Door*, CONSUMER REPORTS, (Jan. 31, 2019), https://www.consumerreports.org/data-theft/the-data-breach-next-door/ (last accessed May 14, 2024).

following state Sub-Class:

> **<u>New Jersey Sub-Class</u>: All residents of Jew Jersey whose Private Information was compromised in the data breach of Continuum's systems from approximately October 18, 2023 to October 19, 2023.**

109. The Nationwide Class and New Jersey Sub-Class are together referred to as the "Classes." Excluded from the Classes are the following individuals and/or entities: Defendant and Defendant's parents, subsidiaries, affiliates, officers, and directors, current or former employees, and any entity in which Defendant has a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; any and all federal, state or local governments, including but not limited to their departments, agencies, divisions, bureaus, boards, sections, groups, counsels and/or subdivisions; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

110. Plaintiff reserves the right to modify or amend the definition of the proposed Classes before the Court determines whether certification is appropriate.

111. <u>Numerosity</u>, Fed R. Civ. P. 23(a)(1): The Classes are so numerous that joinder of all members is impracticable. Defendant has identified more than 377,119 patients whose Private Information may have been improperly accessed in the Data Breach whose Private Information was compromised, and the Classes are apparently identifiable within Defendant's records.

112. <u>Commonality</u>, Fed. R. Civ. P. 23(a)(2) and (b)(3): Questions of law and fact common to the Classes exist and predominate over any questions affecting only individual Class Members. These include:

i. Whether and when Defendant actually learned of the Data Breach and whether its response was adequate;

ii. Whether Defendant owed a duty to the Classes to exercise due care in collecting, storing, safeguarding and/or obtaining their Private Information;

iii. Whether Defendant breached that duty;

iv. Whether Defendant implemented and maintained reasonable security procedures and practices appropriate to the nature of storing Plaintiff's and Class Members' Private Information;

v. Whether Defendant acted negligently in connection with the monitoring and/or protecting of Plaintiff's and Class Members' Private Information;

vi. Whether Defendant knew or should have known that it did not employ reasonable measures to keep Plaintiff's and Class Members' Private Information secure and prevent loss or misuse of that Private Information;

vii. Whether Defendant adequately addressed and fixed the vulnerabilities which permitted the Data Breach to occur;

viii. Whether Defendant caused Plaintiff's and Class Members' damages;

ix. Whether Defendant violated the law by failing to promptly notify Classes that their Private Information had been compromised;

x. Whether Plaintiff and the other Class Members are entitled to actual damages, credit monitoring, and other monetary relief; and

xi. Whether Defendant violated common law and statutory claims alleged herein.

113. Typicality, Fed. R. Civ. P. 23(a)(3): Plaintiff's claims are typical of those of other Class Members, because all had their Private Information compromised as a result of the Data Breach, due to Defendant's misfeasance.

114. Policies Generally Applicable to the Classes: This class action is also appropriate for certification because Defendant has acted or refused to act on grounds generally applicable to the Classes, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Classes and making final injunctive relief appropriate with respect to the Classes as a whole. Defendant's policies challenged herein apply to and affect Classes uniformly and Plaintiff's challenges of these policies hinges on Defendant's conduct with respect to the Classes as a whole, not on facts or law applicable only to Plaintiff.

115. Adequacy, Fed. R. Civ. P. 23(a)(4): Plaintiff will fairly and adequately represent and protect the interests of the Class Members in that they have no disabling conflicts of interest

that would be antagonistic to those of the other Members of the Classes. Plaintiff seeks no relief that is antagonistic or adverse to the Members of the Classes and the infringement of the rights and the damages they have suffered are typical of other Class Members. Plaintiff has retained counsel experienced in complex consumer class action litigation, and Plaintiff intends to prosecute this action vigorously.

116. Superiority and Manageability, Fed. R. Civ. P. 23(b)(3): The class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain class members, who could not individually afford to litigate a complex claim against large corporations, like Defendant. Further, even for those class members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

117. The nature of this action and the nature of laws available to Plaintiff and the Classes make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiff and the Classes for the wrongs alleged because Defendant would necessarily gain an unconscionable advantage since Defendant would be able to exploit and overwhelm the limited resources of each of the individual Classes with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiff was exposed is representative of that experienced by the Classes and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary

and duplicative of this litigation.

118. The litigation of the claims brought herein is manageable. Defendant's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class and Sub-Class Members demonstrates that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

119. Adequate notice can be given to Class and Sub-Class Members directly using information maintained in Defendant's records.

120. Unless a Class-wide injunction is issued, Plaintiff and Class Members remain at risk that Defendant will continue to fail to properly secure the Private Information of Plaintiff and Classes resulting in another data breach, continue to refuse to provide proper notification to Class Members regarding the Data Breach, and continue to act unlawfully as set forth in this Class Action Complaint.

121. Defendant has acted or refused to act on grounds generally applicable to the Classes and, accordingly, final injunctive or corresponding declaratory relief with regard to the Classes as a whole is appropriate under Rule 23(b)(2) of the Federal Rules of Civil Procedure.

122. Likewise, particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to the following:

i. Whether Defendant owed a legal duty to Plaintiff and the Classes to exercise due care in collecting, storing, using, and safeguarding their Private Information;

ii. Whether Defendant breached a legal duty to Plaintiff and Class Members to exercise due care in collecting, storing, using, and safeguarding their Private Information;

iii. Whether Defendant failed to comply with its own policies and applicable laws, regulations, and industry standards relating to data security;

iv. Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach; and

v. Whether Class Members are entitled to actual damages, additional credit monitoring or other injunctive relief, and/or punitive damages as a result of Defendant's wrongful conduct.

**COUNT I**
**NEGLIGENCE**
**(On Behalf of Plaintiff and the Nationwide Class or, in the alternative, the New Jersey Sub-Class)**

123. Plaintiff repeats and realleges paragraphs 1 through 122 set forth above as if they were fully set forth herein.

124. Defendant Continuum owed a duty to Plaintiff and Class Members to exercise reasonable care in safeguarding, securing, and protecting the Private Information in its possession, custody, or control.

125. By collecting and storing this data in its computer system and network, Continuum owed a duty of care to use reasonable means to prevent disclosure of patient PII/PHI, and to safeguard the information from theft. Continuum's duty included a responsibility to implement processes by which it could detect a breach of its security systems in a reasonably expeditious period of time and to give prompt notice to those affected in the case of a data breach.

126. Defendant Continuum knew or should have known the risks of collecting and storing Plaintiff's and all other Class Members' Private Information and the importance of maintaining secure systems.

127. Defendant knew or should have known of the many data breaches that have targeted companies that stored PII and PHI in recent years.

128. Given the nature of Continuum's business, the sensitivity and value of the Private Information it maintains, and the resources at its disposal, Continuum should have identified the vulnerabilities to its systems and prevented the Data Breach from occurring.

129. Continuum breached these duties by failing to exercise reasonable care in safeguarding and protecting Plaintiff's and Class Members' Private information by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems to safeguard and protect Private Information entrusted to them—including Plaintiff's and Class Members' Private Information.

130. Plaintiff and Class Members had no ability to protect their Private Information that was, or remains, in Defendant's possession.

131. It was or should have been reasonably foreseeable to Continuum that its failure to exercise reasonable care in safeguarding and protecting Plaintiff's and Class Members' Private Information by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems would result in the unauthorized release, disclosure, and dissemination of Plaintiff's and Class Members' Private Information to unauthorized individuals.

132. But for Continuum's negligent conduct or breach of the above-described duties owed to Plaintiff and Class Members, their Private Information would not have been compromised. The Private Information of Plaintiff and the Classes was lost and accessed as the proximate result of Continuum's failure to exercise reasonable care in safeguarding, securing, and protecting such Private Information by, *inter alia*, adopting, implementing, and maintaining appropriate security measures.

133. As a result of Continuum's above-described wrongful actions, inaction, and want of ordinary care that directly and proximately caused the Data Breach, Plaintiff and Class Members have suffered and will suffer injury, including, but not limited to: (i) a substantially increased and imminent risk of identity theft; (ii) the compromise, publication, and theft of their

Private Information; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their Private Information; (iv) lost opportunity costs associated with efforts attempting to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their Private Information which remains in Defendant's possession; (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the Private Information compromised as a result of the Data Breach; (vii) overpayment for the services that were received without adequate data security; (viii) loss of privacy from the unauthorized access and exfiltration of Private Information; and (ix) diminished value of Private Information.

134. As a direct and proximate result of Defendant's negligent conduct, Plaintiff and Class Members have suffered injury and are entitled to damages in an amount to be proven at trial.

**COUNT II**
**NEGLIGENCE *PER SE***
**(On Behalf of Plaintiff and the Nationwide Class or, in the alternative, the New Jersey Sub-Class)**

135. Plaintiff repeats and realleges paragraphs 1 through 122 set forth above as if they were fully set forth herein.

136. Pursuant to the FTCA (15 U.S.C. §45), Defendant had a duty to provide fair and adequate computer systems and data security practices to safeguard Plaintiff's and Class Members' Private Information.

137. Pursuant to HIPAA (42 U.S.C. §§1302d, *et seq*.), Defendant had a duty to implement reasonable safeguards to protect Plaintiff's and Class Members' Private Information.

138. Defendant breached its duties to Plaintiff and Class Members under the FTCA (15 U.S.C. §45) and HIPAA (42 U.S.C. §§1302d, *et seq*.), by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiff's and Class Members' Private Information.

139. Defendant's failure to comply with applicable laws and regulations constitutes negligence *per se*.

140. But for Defendant's wrongful and negligent breach of its duties owed to Plaintiff and Class Members, Plaintiff and Class Members would not have been injured.

141. The injury and harm suffered by Plaintiff and Class Members was the reasonably foreseeable result of Defendant's breach of its duties. Defendant knew or reasonably should have known that it was failing to meet its duties, and that Defendant's breach would cause Plaintiff and Class Members to experience the foreseeable harms associated with the exposure of their Private Information.

142. As a direct and proximate result of Defendant's negligent conduct, Plaintiff and Class Members have suffered injury and are entitled to damages in an amount to be proven at trial.

**COUNT III**
**INVASION OF PRIVACY BY INTRUSION**
**(On Behalf of Plaintiff and the Nationwide Class)**

143. Plaintiff repeats and reallege paragraphs 1 through 122 set forth above as if they were fully set forth herein.

144. Plaintiff and Class Members had a reasonable expectation that Defendant would maintain the privacy of the Private Information collected and maintained by Continuum.

145. By failing to keep Plaintiff's and Class Members' Private Information safe, and by misusing and/or disclosing their Private Information to unauthorized parties for unauthorized use, Defendant invaded Plaintiff's and Class members' privacy by: (i) Intruding into their private affairs in a manner that would be highly offensive to a reasonable person; and (ii) Publicizing private facts about Plaintiff and Class members, which is highly offensive to a reasonable person.

146. Defendant failed to protect and safeguard the Private Information entrusted to Continuum and in so doing intruded on the private and personal affairs of Plaintiff and Class

Members in a manner highly offensive to a reasonable person; invaded the privacy of Plaintiff and Class Members by disclosing, without authorization, the Private Information of Plaintiff and Class Members, inconsistent with the purpose of the collection of the Private Information; failed to provide sufficient security to protect the Private Information of Plaintiff and Class Members from unauthorized access; enabled, by failing to protect it sufficiently, the disclosure of Private Information without the consent of Plaintiff or Class Members.

147. Continuum knew, or acted with reckless disregard in not knowing, that the Private Information collected from Plaintiff and Class Members was, because of its nature, subject to a significant risk of unauthorized access.

148. Continuum knew, or acted with reckless disregard in not knowing, that a reasonable person would consider its failure to adequately protect and secure their Private Information to be highly offensive.

149. Continuum's disclosure of Plaintiff and Class Members' Private Information without their consent constituted a violation of the privacy of Plaintiff and Class Members.

150. Continuum's failure to provide sufficient security to protect the Private Information of Plaintiff and Class Members, leading to unauthorized access to that data by unauthorized parties constituted the unlawful publication of that Private Information by Continuum.

151. The Private Information disclosed in the Continuum Data Breach was not generally known to the public and is not a matter of legitimate public concern.

152. Plaintiff and Class Members had a reasonable expectation of the privacy of the Private Information that they provided to their healthcare providers. That reasonable expectation was thwarted by Defendant's actions and inactions and Defendant's conduct constituted an invasion of Plaintiff and Class Members' privacy.

153. As a direct and proximate result of Defendant's negligent conduct, Plaintiff and

Class Members have suffered injury and are entitled to damages in an amount to be proven at trial as well as restitution and injunctive relief.

154. As a direct and proximate consequence of Defendant's invasion of privacy, Plaintiff and Class Members have suffered the injuries alleged above.

**COUNT IV**
**UNJUST ENRICHMENT**
**(On behalf of Plaintiff and the Nationwide Class)**

155. Plaintiff repeats and realleges paragraphs 1 through 122 set forth above as if they were fully set forth herein.

156. Plaintiff and Class Members conferred a monetary benefit on Defendant, by providing it, through Defendant's clients, with their valuable Private Information.

157. Defendant appreciated or had knowledge of the benefits conferred upon it by Plaintiffs and Class Members. Defendant accepted and retained that benefit by accepting and retaining the Private Information entrusted to it. Defendant profited from Plaintiff's and Class Members' retained data and used Plaintiff's and Class Members' Private Information for business purposes.

158. Defendant enriched itself by saving the costs it reasonably should have expended on data privacy and security practices and procedures to secure Plaintiff's and Class Members' Private Information. Instead of providing a reasonable level of security that would have prevented the Data Breach, Defendant instead increased its own profits at the expense of Plaintiff and Class Members by utilizing cheaper, ineffective security measures.

159. Plaintiff and Class Members suffered as a direct and proximate result of Defendant's decision to prioritize its own profit over the requisite security.

160. Under principles of equity and good conscience, Defendant should not be permitted to retain the benefits conferred upon it by Plaintiff and Class Members because Defendant failed

to implement (or adequately implement) reasonable data privacy and security practices and procedures that were also mandated by HIPAA regulations, federal, state and local laws, and industry standards.

161. Plaintiff and Class Members have no adequate remedy at law.

162. As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have suffered and will suffer injury, including but not limited to: (i) invasion of privacy; (ii) lost or diminished value of Private Information; (iii) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (iv) loss of benefit of the bargain; and (vi) the continued and certainly increased risk to their Private Information, which remains unencrypted and available for unauthorized third parties to access and abuse, and remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information.

163. Plaintiff and Class Members are entitled to full refunds, restitution, and/or damages from Defendant and/or an order proportionally disgorging all profits, benefits, and other compensation obtained by Defendant from its wrongful conduct.

164. Defendant should be compelled to disgorge into a common fund for the benefit of Plaintiff and Class Members all unlawful or inequitable proceeds received by Defendant.

165. A constructive trust should be imposed upon all unlawful or inequitable sums received by Defendant traceable to Plaintiff and Class Members.

**COUNT V**
**Violations of the New Jersey Consumer Fraud Act**
**N.J. Stat. §§ 56:8-1 *et seq*. ("NJCFA")**
**(On Behalf of Plaintiff and the New Jersey Sub-Class)**

166. Plaintiff repeats and reallege paragraphs 1 through 122 set forth above as if they were fully set forth herein.

167. This claim is brought by the Plaintiff individually and on behalf of the New Jersey

Sub-Class against Continuum.

168. The NJCFA states:

> The act, use or employment by any person of any commercial practice that is unconscionable or abusive, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice.

N.J. Stat. § 56:8-2.

169. Plaintiff, New Jersey Sub-Class Members, and Defendant are "persons" under the NJCFA. N.J. Stat. § 56:8-1(d).

170. The services that Continuum provided are "merchandise" pursuant to the NJCFA. N.J. Stat. § 56:8-1(c).

171. Continuum committed deceptive omissions in violation of the NJCFA by failing to inform Plaintiff and New Jersey Sub-Class Members that they would not adequately secure Plaintiff's and New Jersey Sub-Class Members' Private Information.

172. Continuum engaged in unfair acts and practices in violation of the NJCFA by failing to implement and maintain reasonable security measures to protect and secure Plaintiff's and New Jersey Sub-Class Members' Private Information in a manner that complied with applicable laws, regulations, and industry standards. The failure to implement and maintain reasonable data security measures for Private Information offends established public policy, is immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers.

173. Due to the Data Breach, Plaintiff and New Jersey Sub-Class Members have lost property in the form of their Private Information. Further, Continuum's failure to adopt reasonable practices in protecting and safeguarding patients' Private Information will force Plaintiff and New Jersey Sub-Class Members to spend time or money to protect against identity theft.

174. Plaintiff and New Jersey Sub-Class Members are now at a substantially higher risk of medical identity theft and other crimes. This harm sufficiently outweighs any justifications or motives for Continuum's practice of collecting and storing Private Information without appropriate and reasonable safeguards to protect such information.

175. Plaintiff and all other New Jersey Sub-Class Members were damaged by Continuum's violation of the NJCFA because: (i) they face a substantially increased risk of identity theft and medical theft—risks justifying expenditures for protective and remedial services for which they are entitled to compensation; (ii) their Private Information was improperly disclosed to unauthorized individuals; (iii) the confidentiality of their Private Information has been breached; (iv) they were deprived of the value of their Private Information, for which there is a well-established national and international market; and (v) they lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risks of medical identity theft they face and will continue to face.

**PRAYER FOR RELIEF**

A. That the Court certify this action as a class action and certify the Class and New Jersey Sub-Class, as proper and maintainable pursuant to Rule 23 of the Federal Rules of Civil Procedure; declare that Plaintiff is a proper class and sub-class representatives; and appoint Plaintiff's Counsel as Class and Sub-Class counsel;

B. That the Court grant permanent injunctive relief to prohibit Continuum from engaging in the unlawful acts, omissions, and practices described herein;

C. That the Court award Plaintiff and members of the Classes compensatory, consequential, and general damages in an amount to be determined at trial;

D. That the Court order disgorgement and restitution of all earnings, profits, compensation, and benefits received by Continuum as a result of its unlawful acts, omissions, and practices;

E. That the Court award statutory damages, trebled, and punitive or exemplary damages, to the extent permitted by law;

F. That Plaintiff be granted the declaratory relief sought herein;

G. That the Court award to Plaintiff the costs and disbursements of the action, along with reasonable attorneys' fees, costs, and expenses;

H. That the Court award pre- and post-judgment interest at the maximum legal rate; and

I. That the Court grant all such other relief as it deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues so triable.

Dated: May 15, 2024

Respectfully submitted,

**GEORGE FELDMAN MCDONALD, PLLC**

*/s/ Janine L. Pollack*
Janine L. Pollack (NJ Bar No. 041671989)
745 Fifth Avenue, Suite 500
New York, NY 10151
Telephone: (561) 232-6002
Facsimile: (888) 421-4173
E-mail: jpollack@4-justice.com
E-Service: eService@4-justice.com

Lori G. Feldman, Esq.*
**GEORGE FELDMAN MCDONALD, PLLC**
102 Half Moon Bay Drive
Croton-on-Hudson, NY 10520
Telephone: (561) 232-6002
Facsimile: (888) 421-4173
lfeldman@4-justice.com
E-Service: eService@4-justice.com

David J. George*
Brittany L. Sackrin*
**GEORGE FELDMAN MCDONALD, PLLC**
9897 Lake Worth Road, Suite 302

Lake Worth, FL 33467
Telephone: (561) 232-6002
dgeorge@4-justice.com
bsackrin@4-justice.com
E-Service: eService@4-justice.com

**Pro Hac Vice Forthcoming*